83 F.3d 1046
 96 Cal. Daily Op. Serv. 2994, 96 Daily Journal
D.A.R. 4975
Fred WAGNER; Scott Serven, d/b/a Wagner/Serven, a
partnership, Plaintiffs-Appellees,
v.
STRATTON OAKMONT, INC.; Mathew Bloom; Neil Kimpermen,
Defendants-Appellants.
 No. 95-35176.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 12, 1995.
Decided April 30, 1996.
 
 Francis L. Van Dusen, Jr., Miller, Nash, Weiner, Hager & Carlsen, Seattle, Washington, for defendants-appellants.
 Barton L. Adams, Adams & Adams, Tacoma, Washington, for plaintiffs-appellees.
 Appeal from the United States District Court for the Western District of Washington; Franklin D. Burgess, District Judge, Presiding, No. CV-94-05551-FDB.
 Before: WRIGHT, ALARCON and CANBY, Circuit Judges.
 CANBY, Circuit Judge:
 
 
 1
 The question presented by this appeal is whether an arbitration agreement signed by a partner when he opened his own individual account with a stockbroker binds his partnership or himself to arbitration of partnership claims against the stockbroker arising from a separate trading account opened in the partnership's name. We hold that it does not, and we therefore affirm the district court's refusal to stay this action pending arbitration.
 
 BACKGROUND
 
 2
 In August 1993, Scott Serven opened a brokerage account with Stratton Oakmont, Inc. On the account application, Serven indicated that the account was an "individual" account, and he listed his social security number as the tax identification number. As part of his account application, Serven signed a customer agreement that provided in relevant part:
 
 
 3
 This agreement ("Agreement") sets forth the terms and conditions under which Bear Stearns Securities Corp., ... will transact business with you, including but not limited to the maintenance of your account(s).
 
 
 4
 ....
 
 
 5
 You agree, and by maintaining an account for you Bear Stearns agrees, that controversies arising between you and Bear Stearns ... shall be determined by arbitration....
 
 
 6
 (Emphasis added). Bear Stearns is Stratton Oakmont's clearing broker. The agreement is made applicable to Stratton Oakmont by the following clause:
 
 
 7
 You agree that your broker [i.e., Stratton Oakmont] and its employees are third-party beneficiaries of this Agreement, and that the terms and conditions hereof, including the arbitration provision, shall be applicable to all matters between or among any of you, your broker and its employees, and Bear Stearns and its employees.
 
 
 8
 (Emphasis added). This agreement, which was signed in Serven's own name, listed only the account opened by Serven in the space provided for account numbers.
 
 
 9
 Within one month, Serven had deposited approximately $412,000 in the account opened in his name. According to Serven this sum consisted of funds that were either personal, drawn from his corporation, or borrowed. At one point, Serven attempted to deposit into this account a check for $98,635.00 that apparently was made payable to Wagner/Serven. Stratton Oakmont refused to deposit the funds and notified Serven that, because the account was an "individual" account, partnership funds could not be deposited without a letter from the partnership indicating that the funds could be placed in Serven's account without the partnership's having any rights to the funds. Serven subsequently provided such a letter, and the funds were deposited.
 
 
 10
 In October 1993, Wagner/Serven opened a brokerage account with Stratton Oakmont. The account application indicated that the account was a "partnership" account, and it listed the Wagner/Serven tax identification number. Shortly thereafter, Serven transferred $400,000 from the account opened in his individual name to the "partnership" account.
 
 
 11
 The partnership's account did not do well. In September 1994, Wagner/Serven brought this action in the Superior Court of the State of Washington against Stratton Oakmont. The complaint alleges six causes of action based on federal and state securities laws, state consumer protection laws, common law fraud, negligence, and breach of fiduciary duty. Stratton Oakmont removed the action to federal court and moved to stay the litigation pending arbitration, pursuant to the arbitration agreement between Serven and Stratton Oakmont. The district court denied the motion, finding that Stratton Oakmont had "provided no facts to support [its] position that a preexisting agreement to arbitrate existed between it and the plaintiff partnership [Wagner/Serven], or alternatively, through the doctrines of apparent authority and/or ratification, that Mr. Serven's individual acts bound the partnership to his agreement with the defendant." This appeal followed.
 
 ANALYSIS
 I.
 
 12
 We first must decide whether the district court or the arbitrators should determine whether an arbitration agreement between the parties exists. Like the district court, we conclude that this was an issue for the district court to decide.
 
 
 13
 The Federal Arbitration Act requires a court to stay an action whenever the parties to the action have agreed in writing to submit their claims to arbitration:
 
 
 14
 If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement....
 
 
 15
 9 U.S.C. § 3 (emphasis added). Under this provision, the question whether the Wagner/Serven partnership is governed by the arbitration agreement must initially be resolved by the district court. See Ralph Andrews Prods., Inc. v. Writers Guild of America, 938 F.2d 128, 130 (9th Cir.1991); cf. Van Ness Townhouses v. Mar Indus. Corp., 862 F.2d 754, 756 (9th Cir.1989) ("When we are asked to compel arbitration of a dispute, our threshold inquiry is whether the parties agreed to arbitrate."). The rationale for such an inquiry comes from the fact that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Tracer Research Corp. v. Nat'l Envtl. Servs. Co., 42 F.3d 1292, 1294 (9th Cir.1994) (quoting United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960)), cert. dismissed, --- U.S. ----, 116 S.Ct. 37, 132 L.Ed.2d 917 (1995).
 
 
 16
 Stratton Oakmont concedes that the district court correctly concluded that the district court must determine whether there is an agreement to arbitrate, but it maintains that the district court should have determined only whether Serven signed the agreement with Stratton Oakmont. Stratton Oakmont contends that, once Serven has signed the agreement, all questions of its effect must be arbitrated. That proposition, however, assumes Stratton Oakmont's position on the merits: that Serven's agreement was effective to bind the partnership to arbitration of partnership claims. For reasons discussed below, we reject that contention. The district court thus did not err, as a threshold matter, in deciding for itself whether the agreement bound the partnership.
 
 II.
 
 17
 We next address whether an arbitration agreement between Wagner/Serven and Stratton Oakmont exists. The district court found no facts to support Stratton Oakmont's claim that an arbitration agreement exists between it and Wagner/Serven, or that the agreement signed by Serven was an exercise of apparent authority or was ratified by the partnership. In addition, the district court held that Wash. Rev.Code § 25.04.090(3)(e) precludes the enforcement of an arbitration agreement against a partnership "unless authorized by the other partners."
 
 
 18
 We review de novo the district court's determination of arbitrability. Republic of Nicaragua v. Standard Fruit Co., 937 F.2d 469, 474, (9th Cir.1991) cert. denied., 503 U.S. 919, 112 S.Ct. 1294, 117 L.Ed.2d 516 (1992). In so doing, we must resolve whether Wagner/Serven and Stratton Oakmont agreed to arbitrate. See Van Ness, 862 F.2d at 756. We interpret the contract by applying general state-law principles of contract interpretation, while giving due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration. Intel Corp. v. Advanced Micro Devices, Inc., 12 F.3d 908, 914 (9th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 2675, 129 L.Ed.2d 810 (1994); cf. Tracer Research, 42 F.3d at 1294 ("[t]he scope of the arbitration clause is governed by federal law.").[1]
 
 
 19
 A. Statutory and Other Authority to Bind the Partnership
 
 
 20
 Stratton Oakmont contends that the district court asked and answered the wrong question. The issue, in the view of Stratton Oakmont, is not whether the partnership agreed to arbitrate, but whether either partner did. Stratton Oakmont emphasizes that Serven's agreement was to arbitrate all disputes with Stratton Oakmont, not just disputes involving the account he was opening. According to Stratton Oakmont, Serven's agreement requires arbitration of the partnership claims because a partnership is not an entity, but rather an association of individuals with a defined business relationship. Thus, whether the partnership as an entity entered into an agreement, it asserts, is irrelevant.
 
 
 21
 Stratton Oakmont's argument is without merit. In the first place, it flies in the face of one of the provisions of the Uniform Partnership Act, as adopted by Washington: Wash. Rev.Code § 25.04.090(2) provides that "[a]n act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners." In addition, Stratton Oakmont's argument overlooks the fact that partnerships have characteristics as entities as well as those of aggregations of individuals under the Uniform Partnership Act ("UPA"), although the UPA generally adopted the "aggregate" theory of partnerships. See generally J. William Callison, Partnership Law and Practice § 3.01, at 3-6 (1992) ("Even if the UPA appears on its face to adopt an aggregate approach to partnerships, a close examination of the UPA demonstrates a preponderance of entity-type characteristics: partnerships can hold title to property; partners do not have individual rights to possess and use partnership property, and are required to account to the partnership for profits arising from their individual use of partnership property; partners are agents of the partnership and can contractually bind it; partners have financial relationships with the partnership; and, the partnership business can continue after dissolution, albeit technically in a new partnership.").[2] Indeed, the State of Washington has recognized that "[u]nder both the common law and the Uniform Partnership Act, partnerships are treated both as aggregates of individuals and entities distinct from the people involved in the partnership." State v. Birch, 36 Wash.App. 405, 675 P.2d 246, 248 (1984).
 
 
 22
 We conclude, therefore, that the district court properly inquired whether Wagner/Serven as a partnership was bound to the arbitration agreement that Serven individually signed. We also conclude that the district court answered the question correctly.[3] There is no evidence that Wagner expressly authorized Serven to bind the partnership to arbitration. Nor is there sufficient evidence of statutory or apparent authority. When Serven opened his individual account and signed the agreement, his act was not "apparently for the carrying on of the business of the partnership in the usual way." See Wash. Rev.Code. § 25.04.090(2). At the time Serven signed the agreement, the partnership did not even exist![4]
 
 
 23
 The district court also did not err in finding that the partnership had not ratified Serven's individual agreement to arbitrate. Wagner/Serven opened its own account and did not in any way adopt, benefit from, or endorse Serven's arbitration agreement on his individual account. See Partnership Law and Practice, supra, § 8.18, at 8-20 ("Generally, an act [becomes ratified] if the partners elect to treat an unauthorized act as though it were authorized, or if the partners conduct themselves as though there were such an election."). Because the partnership is not obligated by the arbitration agreement, we affirm the district court's holding that no arbitration agreement exists between Wagner/Serven and Stratton Oakmont.[5]
 
 III.
 
 24
 Stratton Oakmont raises one final argument. It contends that, even if Serven did not bind the partnership to arbitration, he bound himself and, as an individual partner, his share of the partnership's claims must be submitted to arbitration.
 
 
 25
 This argument suffers from the same deficiency as Stratton Oakmont's argument that an individual agreement of any partner binds the partnership: it ignores the fact that for several purposes, Washington recognizes a partnership as an entity distinct from its partners. We have already held that the partnership did not agree to arbitrate, and by that we mean that the partnership did not agree to arbitrate any part of its partnership claims. To peel off Serven's portion of the partnership claims and send them to arbitration would mean that Serven's agreement to arbitrate his individual claims had, in fact, caused the partnership to arbitrate part of its claims. That result would contravene Wash. Rev.Code § 25.04.090(2) by causing a partnership to be bound by the act of a partner which was "not apparently for the carrying on of the business of the partnership in the usual way."
 
 
 26
 Stratton Oakmont's argument is also impractical and defeats the purpose of arbitration to achieve a speedy and efficient resolution of disputes.[6] That goal is not accomplished by dividing the ownership of each claim and conducting duplicative arbitration and litigation on each partnership claim. Moreover, if we were to adopt Stratton Oakmont's position, future partners would need to be much more cautious about entering partnerships. In addition to being concerned about what their partners do while acting on behalf of the partnership, they would also have to be concerned about what their partners do or have done in the past in their individual capacities.
 
 
 27
 For all of these reasons, we reject Stratton Oakmont's contention that Serven must individually arbitrate his partnership claims.
 
 CONCLUSION
 
 28
 Serven's signing of the arbitration clause did not have the effect of subjecting either Wagner/Serven's claims or Serven's partnership interest in those claims to arbitration. The order of the district court is
 
 
 29
 AFFIRMED.
 
 
 
 [1]
 Under Washington state law, the Restatement's "most significant relationship" test governs the choice of law in contract disputes. Northern Ins. Co. v. Allied Mut. Ins. Co., 955 F.2d 1353, 1359 (9th Cir.), cert. denied, 505 U.S. 1221, 112 S.Ct. 3033, 120 L.Ed.2d 903 (1992). Here, Washington has the most significant relationship with the contract. See id. (listing factors)
 
 
 [2]
 Because of difficulties with the aggregate theory (e.g., the fiction that whenever membership in the partnership changes, a "new" partnership is formed), the Uniform Partnership Act of 1994 explicitly adopted the entity theory. Partnership Law and Practice, supra, at S-5 (Supp.1995)
 
 
 [3]
 Stratton Oakmont has the burden of proving that Serven was acting within his apparent authority. Partnership Law and Practice, supra, § 8.02, at 8-5
 
 
 [4]
 Because the issue is whether the agreement, at the time it was entered, was an act by Serven "not apparently for the carrying on of the business of the partnership in the usual way," we are not convinced by Stratton Oakmont's claims that partnership funds may have been placed in Serven's account at one later time or another. The fact that Stratton Oakmont refused to accept a deposit of a check made out to the partnership until an agreement had been secured from the partnership, indicates that Stratton Oakmont was aware of the individual capacity in which it dealt with Serven
 
 
 [5]
 Because we conclude that Serven's individual agreement did not bind the partnership under ordinary Washington contract and partnership law, we need not address the effect of Wash. Rev.Code § 25.04.090(3), or Stratton Oakmont's challenges to its application. Section 25.090(3) provides that "less than all of the partners have no authority to ... [s]ubmit a partnership claim or liability to arbitration or reference." Stratton Oakmont contends that this provision applies only to claims in existence, not those to arise in the future, and it also contends that, insofar as the provision limits arbitration more severely than normal contract principles, it is preempted by the Federal Arbitration Act, which favors arbitration
 
 
 [6]
 These defects of Stratton Oakmont's argument, along with its contravention of Wash. Rev.Code § 25.04.090(2), would suffice to defeat the argument wholly apart from the more general question of the degree to which Washington partnership law recognizes partnerships as "entities." Cf. Harold Gill Reuschlein & William A. Gregory, The Law of Agency and Partnership § 182, at 264 (2d ed. 1990) ("A pragmatic approach to the controversy [between the entity and aggregate theories] is to reject either theory and simply to solve problems of partnership law as they arise, with the solution being dictated not by legal formalism, but by the merits of particular solutions.")